UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA
-------------------------------------------------------
:
DIRECT SUPPLY, INC.,                              :         CASE NO. 1:11-CV-00683
                                                                  :
        Plaintiff,                                  :
                                                                  :
vs.                                                          :         OPINION & ORDER
                                                                  :         [Resolving Docs. Nos 15, 41, 42 & 47]
SPECIALITY HOSPITALS OF                  :
AMERICA, LLC, et al.,                            :
                                                                  :
        Defendants.                            :
                                                                  :
-------------------------------------------------------

JAMES S. GWIN, UNITED STATES DISTRICT JUDGE:

In this contract dispute, all parties agree that Plaintiff Direct Supply is owed money, but disagree as to who should pay. In 2007, Direct Supply entered into an agreement with Defendant Speciality Hospitals of America (Specialty Hospital) to supply products and services to Specialty Hospital's United Medical Center (UMC) in the District of Columbia (the District). Two years later, the District evicted Specialty Hospital and transferred ownership of UMC to a newly-created governmental corporation, Defendant Not-For-Profit Hospital Corporation (NFP). Throughout this ownership shuffle, Direct Supply remained unpaid. It now asks this Court to make Specialty Hospital pay up, or in the alternative, to find against NFP on equitable grounds. For the following reasons, this Court GRANTS Direct Supply's motion for summary judgment on its breach of contract claim against Specialty Hospital, and DENIES AS MOOT all of Direct Supply's alternative claims. Further, NFP's motions to dismiss, for summary judgment, and to strike the affidavit of Jim Rappaport are DENIED AS MOOT.

I. BACKGROUND

In November 2007, faced with a need to increase medical services east of Anacostia River,

Case No. 1:11-CV-683
Gwin, J.

the District approved a public-private partnership with Specialty Hospital.[1]  The District wanted Specialty Hospital to run the Greater Southeast Community Hospital (GSCH), which primarily served an underserved population.[2]

The partnership agreement recognized that Specialty Hospital would purchase GSCH pursuant to a previously approved asset purchase agreement.[3]  Under the terms of the agreement, Specialty Hospital was a general partner with 1% of the partnership interests, while the District was a limited partner with 99% of the partnership interests.[4]  The District agreed to contribute seventy-nine million dollars in capital.[5]  Importantly for our purposes, Specialty Hospital lacked the authority to unilaterally "obligate, bind or commit [the District] in any way for any obligation."[6]  The agreement made clear that the District would not be liable for "the debts, liabilities, contracts, or any other obligations of the Partnership."[7]

Specialty Hospital maintained and operated GSCH under its wholly owned subsidiary, Capitol Medical Center, LLC (CMC).[8]  It began operation of GSCH under a new name, United Medical Center.  In August 2008 and February 2009, Specialty Hospital entered into two "Product and Services Agreements" with Plaintiff Direct Supply.  The total value of the goods and services rendered was over six hundred thousand dollars.[9]  The contract provided that Direct Supply could

---

[1] Doc. 24-1, at 2.
[2] Doc. 40-1, at 2.
[3] *Id.* at 36.
[4] *Id.* at 38.
[5] *Id.* at 37.
[6] *Id.* at 40, § 4.2(a)..
[7] *Id.* at 43, § 5.1.
[8] Doc. 24-1, at 2.
[9] See doc. 40-1, at 3; doc 15-3, at 38.

Case No. 1:11-CV-683
Gwin, J.

charge Specialty Hospital "a one percent late charge per month for payments that are 30 or more days past due," and that Specialty Hospital agrees "to pay all costs of collection including all reasonable attorney's fees should [it] fail to pay any amounts due" Direct Supply.[10] The parties do not dispute that Direct Supply performed its end of the agreement and delivered the good and services under the contract. It is unclear from the record before this Court when Direct Supply performed the services and delivered the goods under the contract. Specialty Hospital did, however, agree to pay Direct Supply. On August 21, 2009, Specialty Hospital's Regional Controller wrote Direct Supply:

> This letter is to confirm our verbal agreement as discussed . . . concerning [Specialty Hospital's] outstanding accounts receivable balance with Direct Supply, Inc. [Specialty Hospital] is agreeing to pay Direct Supply $25,000 bi-weekly beginning Friday, August 21, 2009, and will continue to pay this amount until the company has closed on its line of credit from [its] lending institution in September.[11]

On June 4, 2010, that same controller forwarded a draft settlement agreement and release to Specialty Hospital. The draft agreement provided that Specialty Hospital would pay Direct Supply a total of $507,431.96.[12] On July 30, 2010, Specialty Hospital wired $50,190.84 to Direct Supply.[13]

Enter, stage-right, the District. According to Specialty Hospital's head, DC approached Specialty Hospital to place geriatric mental health patients at UMC's skilled nursing facility.[14] Specialty Hospital refused. Specialty Hospital now says the District's subsequent acts were to solve the geriatric mental health overpopulation problem at another hospital, St. Elizabeth's.[15]

On July 7, 2010, the District Council passed D.C. Act 18-476, titled the "Not-for-Profit

---

[10] See doc. 40-1, at 21; doc. 15-3, at 40.
[11] Doc. 15-3, at 44.
[12] *Id.* at 46-47.
[13] *Id.* at 52.
[14] Doc. 40-1, at 29.
[15] *Id.*

Case No. 1:11-CV-683
Gwin, J.

Hospital Corporation Establishment Emergency Amendment Act of 2010."[16] The act established NFP "as an instrumentality of the District government . . . to provide community-centered health care east of the Anacostia River . . . ."[17] NFP's property would be established via a mayoral decree that would "transfer all of the assets, including cash, accounts receivable, and real and personal property, of United Medical Center to" NFP.[18] Seeking to stop this transfer, Specialty Hospital gave the District notice that it planned to pursue legal remedies. Specialty Hospital filed suit against the District, and in late 2011, the partes settled the case.[19] Throughout this period, Direct Supply remained unpaid.

In April 2011, Direct Supply filed the instant complaint against both Specialty Hospital and NFP, seeking $462,055.17, and fees, costs, and interest.[20] Direct Supply sought relief on its breach of contract claim against Specialty Hospital, or in the alternative, relief on its *quantum meruit* claim against Specialty Hospital. Were this Court to find against it on its claims against Specialty Hospital, Direct Supply also asked for similar relief against NFP. This Court, in an earlier order, dismissed Direct Supply's contract claim against NFP, but allowed all other claims to proceed.[21] Direct Supply and NFP now move for summary judgment on all claims, and NFP also moves to dismiss for lack of subject-matter jurisdiction.[22]

---

[16] Doc. 41-2, at 5.
[17] *Id.*
[18] *Id.* at 11.
[19] *CMC Realty v. Fenty*, Civ. Action 10-004571-B (D.C. Sup. Ct. 2011).
[20] Doc. 1.
[21] Doc. 27.
[22] The parties engaged in mediation in late 2012, to no avail. The motions in this case became ripe for adjudication in January 2013.

Case No. 1:11-CV-683
Gwin, J.

## II.  LAW & ANALYSIS

For the reasons stated below, this Court finds that there exists a valid contract between Specialty Hospital and Direct Supply, and that Specialty Hospital's defenses to its obligation to pay for the goods and services that it has received.  Therefore, this Court need not reach the sovereign immunity issues raised in NFP's motion to dismiss.

*A.  Direct Supply's Motion for Summary Judgment Against Specialty Hospital*

Plaintiff Direct Supply's motion for summary judgment first asks that judgment be entered against Defendant Specialty Hospital on the breach of contract claims.  In the alternative, it asks for judgment against Defendant Specialty Hospital on the claim for unjust enrichment.

*1.  Breach of contract claim against Specialty Hospital*

Specialty Hospital agrees that Direct Supply provided the good and services to UMC as required by the underlying contract and invoices.[23]  Rather, Specialty Hospital says that it does not have to pay for the goods and services it received because of the affirmative defenses of frustration of purpose and impossibility to excuse its performance.

"Under the frustration of purpose defense, the promissor's performance is excused because changed conditions have rendered the performance bargained from the promisee worthless, not because the promissor's performance has become different or impracticable."[24]  "In the typical scenario, the party is perfectly capable of performing, but the party's reason for doing so no longer exists."[25]

---

[23] Doc. 40, at 9.

[24] *St. Paul Mercury Ins. Co. v. Capitol Sprinkler Inspection, Inc.*, 573 F. Supp. 2d 152, 172 (D.D.C. 2008) (quoting *Island Devel. Corp. v. Dist. of Columbia*, 933 A.2d 340, 349 (D.C. 2007)).

[25] *Island Devel. Corp.*, 933 A.2d at 349 (quoting 14 James P. Nehf, Corbin on Contracts: Impossibility § 77.1, at 243 (Joseph M. Perillo ed., 2001) (alterations omitted).

Case No. 1:11-CV-683
Gwin, J.

No such situation exists here. Frustration of purpose traditionally occurs before the promisee's performance.[26] The affirmative defense envisions an event occurring after the contract's offer and acceptance, but before the parties have done what they contracted to do. Had the District seized UMC prior to Direct Supply's delivery of the contract goods, this defense might hold water. But Direct Supply provided the products and services in March 2009—over a year before the District passed D.C. Act 18-476 and created NFP.[27] Specialty Hospital enjoyed the benefit of the contract for a significant period of time, affirmatively told Direct Supply that it was liable on the contract, and now seeks to escape its corresponding duty. To adopt Specialty Hospital's understanding of the doctrine of frustration would incent promissors to withhold payment indefinitely. Why was the one year that Specialty Hospital had the goods not enough time for it to perform? What if it had not paid for five years? Ten? Although thoroughly briefed by Plaintiff Direct Supply, Defendant Specialty Hospital never produces a compelling response.

Indeed, a close reading of Specialty Hospital's briefing reveals that it never *actually makes* a frustration argument. To be sure, Specialty Hospital lists the elements of a frustration defense by citing the Restatement (Second) of Contracts § 265. But when it applies this case to the elements of the defense, it does so under an *impossibility* framework.[28] But even if Specialty Hospital had undertaken a frustration analysis, the result would be the same. As stated in *Island*, "[t]he object [of the contract] must be so completely the basis of the contract that, as both parties understand, without

---

[26] *See* Restatement (Second) of Contracts § 265, illustration 1 ("A and B make a contract under which B is to pay A $1,000 and is to have the use of A's window on January 10 to view a parade that has been scheduled for that day. Because of the illness of an important official, the parade is cancelled. B refuses to use the window or pay the $1,000. B's duty to pay $1,000 is discharged, and B is not liable to A for breach of contract.").

[27] Doc. 15-2, at 4.

[28] Doc. 40, at 13.

Case No. 1:11-CV-683
Gwin, J.

it the transaction would make little sense."[29] But in the instant case, the transaction did make sense, at least for a year. Further, Specialty Hospital does not provide a single case—from this jurisdiction or elsewhere—to lend support to its theory that a frustration of purpose defense can be asserted after a party's performance.

Finally, Specialty Hospital cannot assert the doctrine of impossibility. Under impossibility, a promissor is excused from performance "because a supervening event changes the nature of the promissor's performance so that it has become commercially impracticable."[30] On page 13 of its opposition to Direct Supply's motion for summary judgment, Specialty Hospital admits that its performance has not become impracticable. Specifically, in explaining why it undertakes a frustration analysis (that is actually an impossibility analysis), Specialty Hospital writes that:

> [Specialty Hospital's] performance is excused because changed conditions (DC/NFP's seizure of the UMC [facility]) have rendered the performance bargained from the promisee (Direct Supply's goods) worthless, *not because the promissor's performance has become different or impracticable (Specialty Hospital's payment is still possible)*.[31]

(emphasis added). But then, on page 14, Specialty Hospital says that its performance *is* commercially impracticable.[32]

Regardless, even if Specialty Hospital had not waived the argument, it would still fail. The doctrine of impossibility relieves a promissor of its obligation to perform in only the most extreme circumstances. "The party asserting the defense of impossibility bears the burden of proving a real

---

[29] *Island Devel. Corp.*, 933 A.2d at 350.
[30] *Id.* at 349.
[31] Doc. 40, at 13.
[32] *Id.* at 14.

Case No. 1:11-CV-683
Gwin, J.

impossibility and not a mere inconvenience or unexpected difficulty."[33] Generally, the defense is successful only "where performance is objectively impossible—that is, the contract is incapable of performance by anyone—rather than instances where the party subjectively claims the inability to perform."[34] Specialty Hospital has made no such showing here.

### 2. *Direct Supply's* quantum meruit *claim against Specialty Hospital*

This Court need not reach Direct Supply's alternative *quantum meruit* claim against Specialty Hospital, as Specialty Hospital's contractual obligation to pay for the goods and services it has received has not been excused. Regardless, the existence of an express contract between the parties generally precludes the assertion of a *quantum meruit* claim.[35]

## B. *Direct Supply's Motion for Summary Judgment Against NFP*

Were this Court to find against Direct Supply on its claims against Specialty Hospital, Direct Supply asks for judgment against NFP or the *quantum meruit* claim. Because all parties agree that Direct Supply and Specialty Hospital executed a valid contract, and because Direct Supply's affirmative defenses are unavailing, this Court need not reach this issue.

### III. CONCLUSION

For the foregoing reasons, this Court GRANTS Direct Supply's motion for summary judgment on its breach of contract claim against Specialty Hospital, and DENIES AS MOOT all of Direct Supply's alternative claims. Further, NFP's motions to dismiss, for summary judgment, and to strike the affidavit of Jim Rappaport are DENIED AS MOOT. Specialty Hospital is hereby

---

[33] *East Capitol View Comm. Devel. Corp. v. Robinson*, 941 A.2d 1036, 1040 (D.C. 2008) (quotation omitted).
[34] *Id.*
[35] *See Plesha v. Ferguson*, 725 F. Supp. 2d 106, 112 (D.D.C. 2010) ("Because both promissory estoppel and unjust enrichment presuppose that an express, enforceable contract is absent, District of Columbia courts generally prohibit litigants from asserting these claims when there is an express contract that governs the parties' conduct.").

Case No. 1:11-CV-683
Gwin, J.

ordered to pay $462,055.17 to Direct Supply, along with interest, late charges, costs, and attorney's fees.

    IT IS SO ORDERED.


Dated: March 27, 2013                        s/ *James S. Gwin*
                                                     JAMES S. GWIN
                                                     UNITED STATES DISTRICT JUDGE